UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
SANDRA DENISE DOUGLAS,

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/8/21

                Plaintiff,

    -against-

ANDREW SAUL, Commissioner of
Social Security,

                Defendant.
-------------------------------------------------------X

**PAUL E. DAVISON, U.S.M.J.**

**DECISION AND ORDER**

20 Civ. 0322 (PED)

      Plaintiff Sandra Douglas brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)

seeking judicial review of a final determination of the Commissioner of Social Security (the

"Commissioner") denying her application for disability benefits.[1]  This case is before me for all

purposes on the consent of the parties, pursuant to 28 U.S.C. § 636(c) (Dkt. #11).

      Presently before this Court are the parties' cross-motions for judgment on the pleadings

pursuant to Rule 12(c) of the Federal Rules of Civil Procedure (Dkt. #18 (plaintiff's motion),

#19 (plaintiff's memorandum of law), #22 (defendant's cross-motion), #23 (defendant's

memorandum of law) and #24 (plaintiff's reply memorandum of law)).  Plaintiff argues, as the

basis for her motion, that the Administrative Law Judge ("ALJ") erred because she: (1) failed to

give controlling weight to the opinion of plaintiff's treating psychiatrist; (2) failed to consider

the impact of plaintiff's asthma and decreased visual acuity on her ability to function in a

workplace setting; (3) erroneously concluded that plaintiff could perform her past work; and (4)

---

[1] Plaintiff alleges entitlement to two types of disability-related benefits under the Social
Security Act:  Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").
Because the definition of "disabled" governing eligibility is the same for DIB and SSI, the term
"disability benefits" refers to both. *See Paredes v. Comm'r of Soc. Sec.*, No. 16 Civ. 810, 2017
WL 2210865, at *1 n.1 (S.D.N.Y. May 19, 2017); 42 U.S.C. §§ 423(d), 1382c(a)(3).

erroneously concluded that there are other jobs existing in the national economy that plaintiff is also able to perform. Dkt. #19, at 24-35.[2] Defendant asserts, in response, that the ALJ applied the correct legal standards and that substantial evidence supports the ALJ's decision. Dkt. #23, at 16-28. For the reasons set forth below, plaintiff's motion is **GRANTED** and defendant's motion is **DENIED**.

## I. BACKGROUND

The following facts are taken from the administrative record ("R.") of the Social Security Administration, filed by defendant on June 8, 2020 (Dkt. #14).

A. Application History

On September 19, 2016, plaintiff filed her claims for disability benefits, alleging that she had been disabled since July 6, 2014 due to high cholesterol, asthma, hepatitis C, depression, anxiety, emotional stress, post-traumatic stress disorder ("PTSD"), insomnia, lack of energy and feeling unable to complete simple tasks. R. 163-73, 217, 220. Her claims were administratively denied on October 31, 2016; plaintiff requested a hearing before an ALJ. On July 19, 2018, a hearing was held before ALJ Sommattie Ramrup. R. 32-68. Plaintiff appeared with counsel and testified at the hearing; Vocational Expert ("VE") Esperanza DiStefano also testified. On November 21, 2018. the ALJ issued a written decision in which she concluded that plaintiff was not disabled within the meaning of the Social Security Act ("SSA"). R. 15-27. The ALJ's decision became the final order of the Commissioner on November 26, 2019, when the Appeals Council denied plaintiff's request for review. R. 1-5. This action followed,

---

[2] Page numbers following citations to "Dkt. #__" reflect ECF pagination.

B.  Consultative Psychiatric Evaluation

On October 21, 2016, psychiatrist Ruby Phillips conducted a consultative examination of plaintiff.  R. 681-84.  Dr. Phillips noted that plaintiff lived with her granddaughters (aged 7 and 8) and arrived to the appointment by bus unaccompanied.  R. 681.  Plaintiff reported that she was last employed as a maintenance worker in 2014 for eight months, and left because she was terminated.  *Id.*

Plaintiff reported symptoms of depression (dysphoric mood), difficulty falling asleep and increased appetite; she denied suicidal/homicidal ideation, intent or plan.  R. 681.  She reported symptoms of anxiety (excessive worrying, nightmares, daily flashbacks and hypervigilance),  *Id.*  She also reported panic attack symptoms (palpitations, breathing difficulties, headaches and fear of losing control) which she stated occurred four times a week, "triggered by external cues of her trauma."  *Id.*  Plaintiff reported that she dresses, bathes and grooms herself, prepares food with her daughter's assistance, does general cleaning, shops with her daughter, managers her own money and takes public transportation.  R. 683.  She reported a close relationship with her daughter and granddaughters.  *Id.*  Plaintiff stated she spends her days sleeping and crying.  *Id.*

Plaintiff was cooperative during the mental status exam, and her manner of relating was adequate.  R. 682.  Dr. Phillips noted that plaintiff was appropriately dressed and well-groomed, and her eye contact was appropriate.  *Id.*  Plaintiff's posture and motor behavior were normal; her speech was fluent, her voice was clear and her speech and language skills were adequate.  *Id.*  According to Dr. Phillips, plaintiff's thought processes were "[c]oherent and goal directed with no evidence of hallucinations, delusions, or paranoia in the evaluation setting" and she was oriented to person, place, and time.  R. 682-83.  Plaintiff's affect was "of full range and appropriate in speech and thought content"; her mood was neutral.  R. 682.  Dr. Phillips noted

that plaintiff's attention and concentration were intact, and she was able to count and perform simple calculations and serial 3's. R. 683. The doctor also noted that plaintiff's recent and remote memory skills were intact, that she was able to recall 3/3 objects immediately and 3/3 after five minutes, and that she could recall six digits forward and three digits backward. *Id.* Dr. Phillips estimated that plaintiff's intellectual functioning was average. *Id.* The doctor also noted that plaintiff's general fund of information was appropriate to experience, and that her insight and judgment were fair. *Id.*

Dr. Phillips evaluated plaintiff's functional abilities as follows: (1) plaintiff can follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, perform complex tasks independently, make appropriate decisions, relate adequately with others; (2) plaintiff is markedly limited in her ability to appropriately deal with stress. R. 683-84. Dr. Phillips opined that plaintiff's "[d]ifficulties are caused by anxiety," and that her psychiatric problems "may significantly interfere with [her] ability to function on a daily basis." R. 684. Dr. Phillips diagnosed PTSD. *Id.* She assessed plaintiff's prognosis as "fair, given adequate treatment" and recommended "[i]ndividual psychological therapy with an evidenced-based protocol for PTSD." *Id.*

C. Treating Psychiatrist's Opinion

On December 10, 2016, plaintiff's treating psychiatrist (Dr. James Herivaux) completed a "Psychiatric Medical Report" form and a "Medical Source Statement." R. 695-702. Dr. Herivaux stated that his most recent mental status examination of plaintiff revealed the following: plaintiff was anxious and tearful; her speech, thought organization and thought content were cognitively intact; her mood was depressed and her affect was mood congruent; her

attention, concentration, long-term and short-term memory were poor; her ability to perform calculations and serial sevens was limited; and her insight and judgment were limited. R. 699-700. Dr. Herivaux assessed plaintiff's ability to perform work-related activities on a sustained basis as follows:

Marked Limitations
-carry out simple or complex instructions
-make judgments on simple or complex work-related decisions
-understand and remember complex instructions
-interact appropriately with supervisors and co-workers
-respond appropriately to usual work situations and to changes in a routine work setting

Moderate Limitations
-understand and remember simple instructions

Mild Limitations
-interact appropriately with the public

R. 695-96.

D. Vocational Expert's Hearing Testimony

At the hearing, the ALJ asked the VE the following question:

I'd like you to assume a hypothetical individual of the claimant's age, education, and past work experience who is able to perform simple, routine, light work. The individual can occasionally climb stairs and ramps, but can never climb ladders, ropes, or scaffolds. The individual can occasionally balance, stoop, kneel, crouch, and crawl. The individual can occasionally interact with coworkers and supervisors, but never with the general public. The individual cannot perform a job with a strictly enforced production quota. Can such an individual perform any of the claimant's past work?

R. 57. The VE responded that such an individual would be able to perform the night cleaner position (which is light and unskilled). R. 58. The ALJ continued: "And if I were to find that that's not past relevant work, is there any other work?" *Id.* The VE responded that such an individual would be able to perform the job of a marker (DOT code 209.587-034; 305,150 positions nationally), a router (DOT code 222.587-038; 52,981 positions nationally) and a silver

-5-

wrapper (DOT code 318.687-018; 107,988 positions nationally). R. 58-59. In response to questions from the ALJ regarding time off task and absences, the VE also testified: (1) there would be a 50% erosion in the number of these jobs for an individual who is off task 15% of the time; and (2) an individual who is absent two days per month on a continuous basis would be unable to maintain employment. R. 59. The ALJ asked: "Is your testimony today consistent with the DOT?" *Id.* The VE responded:

> Yes, your honor, with the exception of my opinion regarding time off task and days absent from work. Those opinions are formed from my over 25 years of experience in placing individuals with physical and/or mental limitations on jobs that are considerate of their limitations, restrictions, interests, and their ability in knowing what employers will tolerate and knowing what their absentee policies are.

R. 60.

> Plaintiff's counsel subsequently questioned the VE, as follows:

> Q. What is the minimal amount of time someone has to be able to stand to hold a light job? I know some may have a sit/stand option, but what would the minimum be for a light job?
> A. Okay. I'm sorry, your question is how long would the individual need to stand?
> Q. Yeah. The minimal amount of time someone has to be able to stand to be able to work in the light level.
> A. At a light level, most individuals are – there would be – light is not only the standing, walking, and sitting to be considered, but also the weight that the individual may need to exert. They may need to exert up to 20 pounds. There may be significant standing, walking, pushing, and/or pulling. It would depend on the essential functions of the job.

R. 60-61. The ALJ interjected:

> ALJ: What about the three jobs you identified?
> VE: The three jobs I identified, the marker, router, and the silver wrapper, the individual would be able to sit and stand at will. It's not an essential function of the job to remain sitting or to remain standing.

R. 61. Plaintiff's counsel resumed questioning:

Q. Suppose someone could only stand two out of – two hours out an eight-hour day, would that be below the standard for a light job?

A. What would they be doing the rest of the time? They would be sitting for six hours. Is that what you're suggesting?

Q. Maybe, or maybe they'd be off task. But are there any jobs – let's assume they can sit. I'm not conceding she can sit, but let's assume she can sit for six hours, but can only stand for two.

A. If the individual can sit for six hours and stand for two hours, they would be able to do either of the three jobs that I identified, the marker, the router, or the silver wrapper.

Q. But what you said was that what makes a job light isn't any one factor, so if the person can neither stand nor lift heavy objects, you said like they require the person to lift 20 pounds but they're sitting. But aren't all these jobs marker, router, wrapper, aren't they – aren't there jobs where the lifting is relatively light as opposed to heavy? I mean, they're not lifting 20 pounds occasionally on those jobs, are they?

A. Well, light work would be exerting force up to 20 pounds occasionally –

Q. Right.

A. – or 10 pounds –

Q. Right.

A. – frequently.

Q. And are they doing that in these jobs?

A. Yes.

Q. These jobs require up to 20 pounds occasionally?

A. Yes, that's what makes them a light position.

Q. All right. Suppose she can only do ten pounds occasionally and no more than five on a more regular basis, would that eliminate these jobs?

A. In my opinion, yes, it would eliminate the jobs. In my opinion –

Q. Okay.

A. – that would be reducing the function to a sedentary level.

R. 61-63.

## II. LEGAL STANDARDS

A. Standard of Review

In reviewing a decision of the Commissioner, a district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). See 42 U.S.C. § 1383(c)(3). "It is not the function of a

reviewing court to decide *de novo* whether a claimant was disabled." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999). Rather, the court's review is limited to "'determin[ing] whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard.'" *Poupore v. Astrue*, 566 F.3d 303, 305 (2d Cir. 2009) (quoting *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002)).

The substantial evidence standard is "even more" deferential than the "'clearly erroneous' standard." *Brault v. Soc. Sec. Admin*, 683 F.3d 443, 448 (2d Cir. 2012). The reviewing court must defer to the Commissioner's factual findings and the inferences drawn from those facts, and the Commissioner's findings of fact are considered conclusive if they are supported by substantial evidence. See 42 U.S.C. § 405(g); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). Substantial evidence is "'more than a mere scintilla'" and "'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "In determining whether the agency's findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (internal quotation marks and citation omitted). "If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld." *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) (citation omitted).

"However, where the proper legal standards have not been applied and 'might have affected the disposition of the case, the court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ. Failure to apply the correct legal standards is grounds for reversal.'" *Velez v. Colvin*,

No. 14 Civ. 3084, 2017 WL 1831103, at *15 (S.D.N.Y. June 5, 2017) (citing *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004)). Thus, "[w]hen there are gaps in the administrative record or the ALJ has applied an improper legal standard," or when the ALJ's rationale is unclear in relation to the record evidence, remand to the Commissioner "for further development of the evidence" or for an explanation of the ALJ's reasoning is warranted. *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996).

B. Statutory Disability

A claimant is disabled under the Social Security Act ("the SSA") when he or she lacks the ability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).[3] In addition, a person is eligible for disability benefits under the SSA only if

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

Id. §§ 423(d)(2)(A), 1382c(a)(3)(B).

Social Security Regulations set forth a five-step sequential analysis for evaluating whether a person is disabled under the SSA:

> (1) whether the claimant is currently engaged in substantial gainful activity;

---

[3] In the event that the regulations and Social Security Rulings cited herein were amended subsequent to the ALJ's decision, I discuss (and have applied) the relevant regulations/rulings as they existed at the time of the ALJ's decision.

(2) whether the claimant has a severe impairment or combination of impairments;
(3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments;
(4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and
(5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre*, 758 F.3d at 150 (citing 20 C.F.R. §§ 404.1520(a)(4)(I)-(v), 416.920(a)(4)(I)-(v)). The claimant bears the burden of proof as to the first four steps of the process. *See Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008). If the claimant proves that his impairment prevents him from performing his past work, the burden shifts to the Commissioner at the fifth and final step. *See Brault*, 683 F.3d at 445.

Additionally, where a claimant suffers from an alleged mental impairment, the ALJ is required to utilize a "special technique" at the second and third steps. *See Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008); *see also* 20 C.F.R. §§ 404.1520a, 416.920a. At step two, in determining whether the claimant has a "severe impairment," the ALJ must rate the claimant's degree of functional limitation in four areas: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. See 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). If the claimant's mental impairment or combination of impairments is severe, then at step three the ALJ must "compare the relevant medical findings and the functional limitation ratings to the criteria of listed mental disorders in order to determine whether the impairment meets or is equivalent in severity to any listed mental disorder." *Kohler*, 546 F.3d at 266 (citing 20 C.F.R. § 404.1520a(d)(2)). *See also* 20 C.F.R. § 416.920a(d)(2). If the claimant suffers from a severe impairment which is not listed (or equivalent in severity to a listed mental disorder), then the

ALJ must assess the claimant's residual functional capacity. *See Kohler*, 546 F.3d at 266 (citing

§ 404.1520a(d)(3)). *See also* 20 C.F.R. § 416.920a(d)(3).

## III. THE ALJ'S DECISION

To assess plaintiff's disability claim, the ALJ followed the five-step sequential analysis

and applied the "special technique" at steps two and three. See 20 C.F.R. §§ 416.920(a)(4)(i)-

(v), 416.920a and discussion, *supra*. At step one, the ALJ concluded that plaintiff had not

engaged in substantial gainful activity since July 6, 2014 (the alleged onset date). R. 18. At step

two, the ALJ concluded that plaintiff has the following severe impairments: arthritis of the

bilateral knees; obesity; and PTSD. *Id.* The ALJ also found, at step two, that plaintiff has the

following non-severe impairments: diabetes mellitus; hepatitis C; hypertension; decreased visual

acuity; asthma; and plantar fasciitis. *Id.*

At step three, the ALJ determined that plaintiff's impairments (individually or combined)

do not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part

404, Subpart P, Appendix 1. R. 19-20. In particular, the ALJ found that plaintiff's mental

impairment does not meet or medically equal the criteria of listing 12.15. R. 19.[4] In making this

finding, the ALJ first considered whether the "paragraph B" criteria are satisfied. *Id.* "To

satisfy the 'paragraph B' criteria, the mental impairment must result in at least one extreme or

two marked limitations in a broad area of functioning." *Id.* The ALJ found that plaintiff has

mild limitations in understanding/remembering/applying information, moderate difficulties in

her ability to interact with others, mild difficulties with concentration/persistence/maintaining

pace and mild limitations in adapting/managing oneself. R. 20. Thus, the ALJ concluded that

---

[4] Listing 12.15 is the listing for "trauma- and stressor-related disorders." *See* 20 C.F.R.
Pt. 404, Subpt. P, App. 1, § 12.15.

the "paragraph B" criteria are not satisfied. *Id.* The ALJ also considered whether the "paragraph C" criteria are satisfied, and concluded that "the evidence fails to establish the presence of the 'paragraph C' criteria." *Id.* Finally, the ALJ noted that the limitations identified in the paragraph B criteria "are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process," whereas "the mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment." R. 21. Accordingly, the ALJ noted that the RFC assessment "reflects the degree of limitation [I have] found in the 'paragraph B' mental functional analysis." *Id.*

Next, the ALJ assessed plaintiff's RFC as follows:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant is able to perform simple, routine light work; she can sit for a total of six (6) hours in an 8-hour day and stand for a total of two (2) hours in an 8-hour day. The claimant can occasionally climb stairs and ramps, but never climb ladders, ropes or scaffolds. The claimant can occasionally balance, stoop, kneel, crouch and crawl. The claimant can occasionally interact with co-workers and supervisors but never with the general public. The claimant cannot perform a job with a strictly-enforced production quota.

*Id.* In reaching this conclusion, the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" and "opinion evidence in accordance with the requirements of 20 C.F.R. 404.1527 and 416.927." *Id.*

At step four, the ALJ determined that plaintiff "is capable of performing past relevant work as a Night Cleaner." R. 25. In the alternative, the ALJ continued to step five and concluded, based upon the vocational expert's testimony, that plaintiff "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy."

R. 25-26.  Thus, the ALJ found plaintiff "not disabled" as defined in the SSA.  R. 26.

## IV. ANALYSIS

A. <u>Weight Accorded to Dr. Herivaux's Opinion</u>

Plaintiff argues that the ALJ erred because she did not accord controlling weight to Dr. Herivaux's opinion.  "Social Security Administration regulations, as well as [Second Circuit] precedent, mandate specific procedures that an ALJ must follow in determining the appropriate weight to assign a treating physician's opinion." *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019).  "First, the ALJ must decide whether the opinion is entitled to controlling weight." *Id.* The ALJ must give controlling weight to a treating physician's opinion as to the nature and severity of the impairment if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Id.* (quoting *Burgess*, 537 F.3d at 128).  If a treating physician's opinion is contradicted by or inconsistent with other substantial evidence in the record, the ALJ may give that treating source's opinion less weight.  *See Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).

Second, if the ALJ does not give controlling weight to a treating source's opinion, the ALJ must consider various factors and provide "good reasons" for the weight given.  20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6);  *see also Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015).  These "nonexclusive *Burgess* factors [include]:  (1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Estrella*, 925 F.3d at 95-96 (quotation marks and citations omitted).  In order to override an opinion from a treating physician, the ALJ must "explicitly consider" the *Burgess*

factors. *Greek*, 802 F.3d at 375 (quoting *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (per curiam)). "An ALJ's failure to 'explicitly' apply the *Burgess* factors when assigning weight at step two is a procedural error." *Estrella*, 925 F.3d at 96. If the ALJ has not otherwise provided "good reasons" for the weight accorded to a treating physician's opinion, the case must be remanded unless "a searching review of the record" assures the Court that the ALJ applied "the substance of the treating physician rule." *Id.*[5]

Here, the ALJ addressed Dr. Herivaux's opinion as follows:

> Treating psychiatrist James Herivaux, M.D. opined in December 2016 that the claimant has marked limitations in making judgments on work-related decisions, carrying out complex tasks, interacting with supervisors and coworkers, responding to changes in routine work setting, and mild limitation in interacting with the public (Exhibits 12F and 13F). This opinion is given partial weight as it is based on the claimant's subjective complaints, and inconsistent with Dr. Herivaux's own treatment notes showing that the claimant's symptoms are adequately controlled with medications and the claimant reported no side effects from 2016 through 2018, other than with respect to the Ambien (Exhibit 15F). The opinion is also inconsistent with the claimant's admission that she has chosen not to work because she has full custody of her grandchildren, and treatment notes showing that the claimant's stressors primarily stem from childcare obligations and involvement with the family court system regarding custody issues (Exhibit 15F).

R. 24.

In my view, upon careful review of the record, the ALJ applied the substance of the treating physician rule and properly articulated her reasons for the weight she gave to Dr. Herivaux's opinion. "When determining the weight that should be assigned to a treating physician's opinion, the ALJ may also consider: the opinions of other medical experts that conflict with those of the claimant's treating physician; a lack of objective medical evidence

---

[5] Although the SSA revised its rules to eliminate the "treating physician rule," it remains applicable to claims filed before March 27, 2017. *See, e.g., Salati v. Saul*, 415 F. Supp. 3d 433, 447 (S.D.N.Y. 2019).

supporting the treating physician's opinion; and evidence from the claimant herself that undermines her treating physician's opinion about her limitations." *Quintana v. Berryhill*, No. 18 Civ. 0561, 2019 WL 1254663, at *10 (S.D.N.Y. Mar. 19, 2019) (citations omitted). Here, the ALJ's decision included a discussion of plaintiff's treatment history and mental health treatment notes, and examined Dr. Herivaux's opinion in the context of discussing additional opinion evidence from consultative psychiatric examiner Dr. Phillips. R. 23-24. Thus, it is clear that the ALJ considered the amount of medical evidence supporting Dr. Herivaux's opinion and its consistency with the remaining medical evidence. Indeed, the court's review of the objective medical evidence in the record reveals that Dr. Herivaux's opinion is inconsistent with treatment notes reflecting plaintiff's unvarying reports (between December 2015 and May 2018) of "all symptoms adequately controlled" by medication, without side effects. R. 909, 924, 928-29, 949, 956, 961, 972, 979, 989, 1000, 1007, 1018, 1022-23, 1027-28, 1034, 1043, 1046-47, 1053, 1061, 1067, 1073. Further, as the ALJ noted, plaintiff "verbalized that she is not thinking about employment at present" because she was raising her young grandchildren; she "reported that she gets benefits for them and that is how she maintains herself and the household." R. 900.

Plaintiff specifically argues that the ALJ improperly accorded "great weight" to the opinion of consultative examiner Dr. Phillips while improperly discounting Dr. Herivaux's opinion. Dkt. #19, at 34-35. The Second Circuit has "frequently cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination." *Estrella*, 925 F.3d at 98 (quotation marks and citation omitted). Nonetheless, "[i]t is not per se legal error for an ALJ to give greater weight to a consulting opinion than a treating opinion." *Rivera v. Colvin*, No. 13 Civ. 7150, 2015 WL 1027163, at *16 (S.D.N.Y. Mar. 9, 2015) (citing *Rosier v. Colvin*, No. 13-4490-CV, 2014 WL 5032325 at *2 (2d Cir. Oct.9, 2014) (summary order)). However,

"such a decision must be based upon proper consideration of relevant factors and sufficiently explained." *Mercado v. Colvin*, No. 15 Civ. 2283, 2016 WL 3866587, at *20 (S.D.N.Y. July 13, 2016) (citing 20 C.F.R. § 404.1527(c)(1)-(6), (e)(2)(ii) (requiring explanation of weight determination); *Peryea v. Comm'r of Soc. Sec.*, No. 13 Civ. 173, 2014 WL 4105296, at *8 (N.D.N.Y. Aug. 20, 2014) ("[Consulting] opinions must be evaluated according to the criteria governing all medical opinions.")). Here, the ALJ articulated good reasons for the weight she accorded Dr. Phillips's opinion. The ALJ gave great weight to the portion of Dr. Phillips's opinion which found no limitations, based upon her examination findings and the opinion's consistency with the overall medical record. R. 24. Conversely, the ALJ gave little weight to Dr. Phillips's opinion that plaintiff is markedly limited in her ability to appropriately deal with stress, on the ground that it is inconsistent with the treatment records and the fact that plaintiff is the primary caretaker of two young grandchildren (for whom she was seeking custody). *Id.* Nonetheless, the ALJ's RFC accounted for plaintiff's difficulties dealing with stress by restricting her to simple, routine work, limiting her interaction with co-workers and supervisors, restricting interaction with the general public and restricting plaintiff from jobs with strictly-enforced production quotas. R. 21.

"An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record." *Danielle R. v. Comm'r of Soc. Sec.*, No. 19 Civ. 00538, 2020 WL 2062138, at *2 (N.D.N.Y. Apr. 29, 2020) (citing *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) ("we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony")). Here, the ALJ reviewed the entire medical record, including the evidence plaintiff emphasizes, evaluated the opinion evidence within that context and sufficiently explained the weight she accorded each opinion. "It is

within an ALJ's discretion to resolve genuine conflicts in the medical evidence." *Martes v. Comm'r of Soc. Sec.*, 344 F. Supp.3d 750, 760 (S.D.N.Y. 2018) (quoting *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002)). In sum, based upon a "searching review of the record," the Court is satisfied that the ALJ properly weighed Dr. Herivaux's opinion, proffered "good reasons" for discounting it and applied the substance of the treating physician rule. Accordingly, plaintiff's contention that the ALJ erred by failing to give controlling weight to Dr. Herivaux's opinion is meritless.

B. <u>Impact of Non-Severe Impairments on RFC</u>

Plaintiff complains that the ALJ failed to state how plaintiff's non-severe impairments of asthma and decreased visual acuity would affect plaintiff's RFC. Dkt. #19, at 29. Plaintiff specifically contends (1) her asthma should have precluded the night cleaner and silver wrapper positions, and (2) her decreased visual acuity precludes the positions of router and marker (which require reading small print). *Id.* The Commissioner generally asserts that the RFC determination was supported by substantial evidence, but does not specifically address plaintiff's contentions. Dkt. #23, at 19-23.

SSA regulations specifically state: "We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not "severe," as explained in §§ 404.1520(c), 404.1521, and 404.1523, when we assess your residual functional capacity." 20 C.F.R. § 404.1545(a)(2). Thus, an ALJ's RFC determination "must account for limitations imposed by both severe and nonsevere impairments." *Graham v. Berryhill*, No. 16 Civ. 6787, 2017 WL 5019274, at *3 (W.D.N.Y. Nov. 3, 2017). *See Parker-Grose v. Astrue*, 462 F. App'x 16, 18 (2d Cir. 2012) (summary order); *Cardoza v. Comm'r of Soc. Sec.*, 353 F. Supp. 3d 267, 280 (S.D.N.Y. 2019). Here, although the ALJ

-17-

acknowledged plaintiff's medically determinable, non-severe impairments of asthma and decreased visual acuity, the ALJ did not specifically acknowledge her duty to consider those impairments in her RFC analysis, nor is there any indication that she did so. Nonetheless, the ALJ's error is harmless if substantial evidence establishes that plaintiff's asthma and decreased visual acuity were inconsequential to the ALJ's RFC determination. *See Trombley v. Colvin*, No. 15 Civ. 0567, 2016 WL 5394723, at *17-18 (N.D.N.Y. Sept. 27, 2016).

References to plaintiff's vision problems appear only three times in the record:

• On October 21, 2016, during a consultative physical examination with Dr. Cheryl Archbald, plaintiff's vision at 20 feet, uncorrected, was right 20/100, left 20/70 and both 20/70. R. 642.

• On October 28, 2016, during an office visit for diabetes treatment and prescription refills, plaintiff complained of blurred vision and was referred to an optometrist. R. 779, 781, 783.

• On November 16, 2016, plaintiff reported that her blurred vision subsided on November 3, 2016 after she completed a four-week prescription course of Zepatier (prescribed for hepatitis C). R. 787.

Thus, the record indicates that plaintiff's vision problems were transitory, confined to a four-week period in October and November 2016.[6] Accordingly, because plaintiff's decreased visual acuity was clearly inconsequential to the ALJ's RFC determination, the ALJ's failure to consider this impairment in her RFC analysis was harmless error.

---

[6] Dr. Archbald opined that plaintiff "should limit activities involving fine visual acuity." R. 643. Her consultative opinion was based upon a single examination, which occurred during the four weeks in question. The ALJ accorded partial weight to Dr. Archbald's opinion. R. 24. Plaintiff does not challenge that determination.

Unlike plaintiff's vision difficulties, her asthma is referenced more consistently throughout the medical record. At a physical examination on December 8, 2015, plaintiff reported "mild" asthma, with "fairly controlled" symptoms which are triggered by certain factors (including cold weather). R. 703. Plaintiff stated that she "does not have albuterol anymore" although it relieved her symptoms. *Id.* She was diagnosed with "[m]ild intermittent asthma with acute exacerbation" and prescribed albuterol. R. 705-06. On March 17, 2016, plaintiff sought treatment for what she described as "mildly severe" asthma. R. 543. Plaintiff described her asthma as "allergic, exercise-induced and seasonal." *Id.* She stated that her symptoms were aggravated by smoke and stress, and relieved by inhalers. *Id.* Her diagnosis was unchanged; albuterol was prescribed. R. 546. At a FEDCAPS examination on June 17, 2016, plaintiff reported "chronic" asthma ("mild to moderate") which impaired her ability to walk, climb stairs, cook, shop and do housekeeping. R. 343-44, 361. A physical examination revealed no asthma-related symptoms; plaintiff's diagnosis was "stable" asthma. R. 367-68, 380. On September 26, 2016, plaintiff reported that she had run out of albuterol and was "coughing daily." R. 492. She was (again) diagnosed with "[m]ild intermittent asthma with acute exacerbation" and prescribed albuterol and flovent. R. 495-96.

From October 2016 through March 2017, the record contains no complaints of asthma-related symptoms. R. 779-810, 1079-83, 1089-99. Treatment notes from a follow-up medical visit on April 6, 2017 reflect plaintiff's history of "mild persistent asthma" but no complaints of associated symptoms. R. 817-21. Plaintiff's asthma medications (Symbicort and an inhaler) were designated to be discontinued as of April 11, 2017. R. 818, 820. Treatment notes from May 5, 2017 through November 10, 2017 reveal no complaints of asthma-related symptoms and no asthma medications. R. 823-27, 829-33, 1118-34. Plaintiff's asthma medications (Symbicort

and an inhaler) were reissued pursuant to an office visit on March 12, 2018 (although treatment notes from that visit do not reflect specific complaints of asthma-related symptoms). R. 1141-48. Treatment notes from March 26, 2018, May 17, 2018 and May 29, 2018 reflect plaintiff's ongoing prescriptions for asthma medications. R, 1155-59, 1161-68, 1169-72. A Care Management Summary dated June 18, 2018 indicates "[m]ild persistent asthma with routine monitoring" and reflects active prescriptions for asthma medication. R. 1264, 1266.

In sum, the medical evidence indicates that plaintiff suffers from mild, intermittent (but ongoing) asthma with acute exacerbation, controlled by medication (including an inhaler for acute episodes). Given this record, the ALJ's apparent failure to consider whether environmental restrictions were necessary due to plaintiff's asthma is not harmless error, warranting remand. *See Grant v. Saul*, No. 18 Civ. 0261, 2020 WL 1307106, at *6-7 (D. Conn. Mar. 18, 2020). On remand, the ALJ may find that plaintiff's asthma is inconsequential and, thus, reject the need to incorporate environmental limitations into the RFC – but she must explain her reasoning for doing so.

C. Step Four

Plaintiff argues that the ALJ erred (at Step Four) in determining that plaintiff could perform her past work as a night cleaner. Dkt. #19, at 27. The Commissioner contends that the ALJ's determination is supported by substantial evidence. Dkt. #23, at 24. Specifically, the Commissioner asserts that the ALJ properly relied upon the testimony of VE DiStefano who, according to the Commisioner, "testified at the hearing that an individual with the residual functional capacity the ALJ assessed could do the light, unskilled work of a night cleaner." *Id.* The Commissioner is mistaken.

At the hearing, the ALJ asked the VE the following question:

I'd like you to assume a hypothetical individual of the claimant's age, education, and past work experience who is able to perform simple, routine, light work. The individual can occasionally climb stairs and ramps, but can never climb ladders, ropes, or scaffolds. The individual can occasionally balance, stoop, kneel, crouch, and crawl. The individual can occasionally interact with coworkers and supervisors, but never with the general public. The individual cannot perform a job with a strictly enforced production quota. Can such an individual perform any of the claimant's past work?

R. 57. The VE responded that such an individual would be able to perform the night cleaner position (which is light and unskilled). R. 58. The ALJ relied upon this testimony for her conclusion, at step four, that plaintiff was able to perform her past work as a night cleaner. R. 25. This was error. The hypothetical posed to the VE did not accurately reflect plaintiff's RFC, which included the limitation that plaintiff "can sit for a total of six (6) hours in an 8-hour day and stand for a total of two (2) hours in an 8-hour day." R. 21. Accordingly, substantial evidence does not support the ALJ's conclusion that plaintiff could perform her past work as a night cleaner.

At first blush, it appears that the ALJ's step four error may be harmless because she continued to step five (in the alternative) and concluded, based upon the vocational expert's testimony, that plaintiff "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." R. 25-26. However, for reasons discussed below, the ALJ also erred at step five. Accordingly, I cannot conclude that the step four error was harmless and remand for reconsideration, at step four, as to whether plaintiff has the RFC to perform the requirements of her past relevant work.

D. Step Five

"In the ordinary case, the Commissioner meets his burden at the fifth step by resorting to the applicable medical vocational guidelines (the grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2

(1986)." *Roma v. Astrue*, 468 F. App'x 16, 20 (2d Cir. 2012) (quotation marks and citation omitted). The grids are published tables and administrative rules that can be used in certain cases to "direct[ ] a conclusion as to whether the individual is or is not disabled." 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(a). "Although the grid results are generally dispositive, exclusive reliance on the grids is inappropriate where the guidelines fail to describe the full extent of a claimant's physical limitations." *Roma*, 486 F. App'x at 20. Therefore, where a claimant's physical ability "falls between the ranges of work indicated in the rules (e.g. the individual can perform more than light but less than medium)." the grids only "provide guidance for decisionmaking." 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(d). "In any instance where a rule does not apply, full consideration must be given to all of the relevant facts of the case in accordance with the definitions and discussions of each factor in the appropriate sections of the regulations." *Id.* § 200,00(a).

Here, the ALJ found that plaintiff retained the RFC for light work except she was limited, *inter alia*, to two hours of standing and six hours of sitting in an eight-hour workday. R. 21. Plaintiff contends, based upon this limitation, that the ALJ (at step five) should have found her limited to sedentary work and, therefore, disabled pursuant to the grids.[7] Dkt. #19, at 24-29. The Commissioner asserts that the ALJ properly relied on the testimony of the VE as a basis for finding there are jobs at the light exertional level that exist in significant numbers in the national economy which plaintiff can perform. Dkt. #25, at 24-28.

SSA regulations define sedentary and light work as follows:

---

[7] Under the Guidelines, an individual whose past work is unskilled is deemed disabled when he/she is closely approaching advanced age with a high school education or more, and is limited to sedentary work. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 201.12.

(a) Sedentary work. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

(b) Light work. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(a)-(b); 416.967(a)-(b). "These terms have the same meaning as they have in the Dictionary of Occupational Titles ["DOT"], published by the Department of Labor."

*Id.* SSR 83-10 further explains:

> "Occasionally" means occurring from very little up to one-third of the time. Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday. . . .
> . . .
> "Frequent" means occurring from one-third to two-thirds of the time. Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday.

SSR 83-10, 1983 WL 31251, at *5-6 (Jan. 1, 1983).

Here, plaintiff's RFC did not coincide completely with the definition of either light or sedentary work. The ALJ also noted that plaintiff "was born on September 23, 1964 and was 49 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date." R. 25. Because plaintiff was "an individual closely approaching advanced age," the grid rules for sedentary and light work reach opposite conclusions. *See* 20

C.F.R. Pt 404, Subpt. P, App. 2, §§ 201.12 (sedentary work, disabled) and 202.14 (light work, not disabled). Under these circumstances, SSR 83-12 clarifies the use of the grids as a "framework":

> If the exertional level falls between two rules which direct opposite conclusions, i.e., "Not disabled" at the higher exertional level and "Disabled" at the lower exertional level, consider as follows:
>    a. An exertional capacity that is only slightly reduced in terms of the regulatory criteria could indicate a sufficient remaining occupational base to satisfy the minimal requirements for a finding of "Not disabled."
>    b. On the other hand, if the exertional capacity is significantly reduced in terms of the regularity definition, it could indicate little more than the occupational base for the lower rule and could justify finding of "Disabled."
>    c. In situations where the rules would direct different conclusions, and the individual's exertional limitations are somewhere "in the middle" in terms of the regulatory criteria for exertional ranges of work, more difficult judgments are involved as to the sufficiency of the remaining occupational base to support a conclusion as to disability. Accordingly, VS assistance is advisable for these types of cases.

SSR 83-12, 1983 WL 31253, at *2-3 (Jan. 1, 1983). "In other words, an ALJ can properly find a claimant capable of performing a limited range of work in a given exertional category and then elicit VE testimony to determine whether that claimant is disabled." *Miller v. Astrue*, No. 11 Civ. 4103, 2013 WL 780232, at *8 (E.D.N.Y. Mar. 1, 2013) (quotation marks and citation omitted).

Here, the ALJ conducted an SSR 83-12 analysis:

> If the claimant had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.14. However, the claimant's ability to perform all or substantially all of the the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled light occupational base, I asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations, such as:

1) Marker: DOT code 095.870-034,[8] unskilled SVP 2, at the light exertional level with 305,150 such jobs in the national economy;
2) Silver Wrapper: DOT code 318.687-018, unskilled SVP 2, at the light exertional level with 107.988 such jobs in the national economy; and,
3) Router: DOT code 222.587-038, unskilled SVP 2, at the light exertional level with 52,981 such jobs in the national economy.

R. 26. Based upon the VE's testimony, the ALJ concluded that plaintiff "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy" and, accordingly, found plaintiff not disabled. *Id.*

The ALJ's analysis is flawed. The VE gave that testimony in response to a hypothetical which did not include the standing/sitting limitation. R. 57-59. Subsequently, during the course of questioning by plaintiff's counsel, the VE testified that an individual who can sit for six hours and stand for two hours would be able to perform any of the three identified jobs (marker, router, silver wrapper). R. 61. According to the VE: "The three jobs I identified, the marker, router, and the silver wrapper, the individual would be able to sit and stand at will. It's not an essential function of the job to remain sitting or to remain standing." *Id.* But the VE also testified that the three identified jobs were categorized as "light" positions because they require lifting up to twenty pounds occasionally or up to ten pounds frequently. R. 62. "Frequent" lifting "requires being on one's feet up to two-thirds of a workday." SSR 83-10, 1983 WL 31251, at *6. Thus, the ALJ's testimony that an individual in either of the three identified jobs could sit or stand at will is inconsistent with the DOT's requirement of lifting up to ten pounds frequently. SSR 00-4p requires that:

> Occupational evidence provided by a VE or VS generally should be consistent
> with the occupational information supplied by the DOT. When there is an

_____

[8] The VE testified that the DOT code for a Marker is 209.587-034. The ALJ's misstatement of the DOT code appears to be administrative error.

apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. . . . The adjudicator will explain in the determination or decision how he or she resolved the conflict. The adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified.

SSR 00-4p, 2000 WL 1898704, at *2-4 (Dec. 4, 2000). Here, the ALJ failed to elicit a reasonable explanation for the conflict and explain its resolution before relying on the VE's testimony to support the decision that plaintiff is not disabled.[9] Accordingly, remand is necessary for further development of the record and a fulsome discussion which satisfies the Commissioner's burden at step five. On remand, the ALJ should also ask the VE if, and/or to what extent, the standing/sitting limitation impacts or erodes the number of available positions.[10]

## V. CONCLUSION

For the reasons set forth above: (1) the Commissioner's motion is **DENIED**; (2) plaintiff's motion is **GRANTED**; and (3) the case is **REMANDED** for further administrative proceedings consistent with this Decision and Order pursuant to 42 U.S.C. § 405(g), sentence four.

---

[9] Although the ALJ asked the VE whether her testimony was consistent with the DOT, that question was posed prior to any colloquy incorporating the plaintiff's standing/sitting limitation. R. 26, 59-60.

[10] The court notes that plaintiff reached age 55 on September 23, 2019, approximately ten months after the ALJ's decision. Under the regulations, a 55-year-old individual is considered to be of "advanced age." 20 C.F.R. §§ 404.1563(e); 416.963(e). Thus, it appears plaintiff may be disabled under the grids as of September 23, 2019, even if she can perform certain light work. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 202.06. The parties have not briefed this issue and I decline to reach it *sua sponte*, particularly because the case is being remanded for other reasons. However, on remand, the ALJ should consider the changed circumstances in deciding whether plaintiff is entitled to benefits.

The Clerk of the Court is directed to terminate the pending motions (Dkt. #18, #22) and close this case.

Dated: July **8**, 2021
      White Plains, New York

                                  **SO ORDERED:**

                                  PAUL E. DAVISON, U.S.M.J.